## In the Matter of the Petition of A. J. SNYDER, for a Writ of Habeas Corpus.

1. HABEAS CORPUS; *Practice; Power of Court, or Judge.* Under section 672 of the code, Gen. Stat. 1868, p. 763, the judge or court issuing a writ of *habeas corpus* on a petition complaining that the person in whose behalf the writ is applied for is restrained of his liberty without probable cause, may, even in case there is no defect in the charge or process, summon the prosecuting witnesses, investigate the criminal charge, and discharge, let to bail, or recommit the prisoner, as may be just and legal.

2. FALSE PRETENSES; *Belief of Injured Party; Proof; Mental Emotions; Competency of Testimony.* On the hearing and determination of a cause arising upon a writ of *habeas corpus,* before a judge or court investigating the criminal charge against a person committed by an examining magistrate for the offense of having obtained money or property by false pretenses, the prosecutor, when examined as a witness, may testify that he believed the pretenses, and, confiding in their truth, was induced thereby to part with his money or property.

3. —————— *What Constitutes Offense of Obtaining Goods by False Pretenses.* It is not necessary, to constitute the offense of obtaining goods by false pretenses, that the owner has been induced to part with his property solely and entirely by pretenses which are false; nor need the pretenses be the paramount cause of the delivery to the prisoner. It is sufficient, if they are a part of the moving cause, and, without them, the defrauded party would not have parted with the property.

4. —————— A pretense which is false when made, but true by the act of the person making the same when the prosecutor relies thereon and parts with his property, is not a false pretense within the statute.

5. —————— *False Pretense must be as to Past, or Present Existing Facts.* To hold a person for trial who is charged with obtaining money or property by false pretense, it must appear that the pretense relied upon relates to a past event, or to some present existing fact, and not to something to happen in the future. A mere promise is not sufficient.

### Original Proceedings in Habeas Corpus.

PETITION filed in this court on the 2d of January 1877, on behalf of *A. J. Snyder,* for a writ of *habeas corpus.* The petition sets forth the following facts:

"That A. J. Snyder was illegally restrained of his liberty

in the county jail, at Mound City, the county-seat of Linn county, by D. R. Lamoreau, as sheriff of said county; that said D. R. Lamoreau pretends to restrain said A. J. Snyder of his liberty by virtue of some pretended proof, the precise nature of which is unknown to your petitioner, the justice before whom he was examined not having reduced such testimony to writing. Your petitioner further represents unto your honorable court that such illegal restraint consists in the following: that on the 1st day of December 1876, said A. J. Snyder was arrested upon the charge of obtaining money under false pretenses, and taken before one A. D. Hyatt, a justice of the peace in and for Linn county, for preliminary examination; that upon such examination there was no evidence offered which showed or tended to show in any manner that an offense had been committed against or under the laws of the state of Kansas; nor was there any evidence offered which showed, or in any manner tended to show, that there was any probable cause for believing that said A. J. Snyder had been guilty of any offense whatever under the laws of the state of Kansas. Yet notwithstanding the premises, the said justice of the peace refused to discharge the said A. J. Snyder, or to admit him to bail, as under the laws of the state of Kansas he was required to do."

The petition further alleged that the order or warrant of commitment under which *Snyder* was held in custody was illegal, and insufficient in law. It also states that the reason the application was not made to the probate judge of Linn county, was, "that such probate judge is disqualified from hearing the same by reason of being an attorney-of-record in a civil suit involving the same transaction." And the petition further alleges, "that an application was made to the Hon. W. C. Stewart, judge of the 6th judicial district, in which Linn county is, for a writ of *habeas corpus*, and that said application was refused." The usual prayer for the issuance of the writ was also annexed thereto. Upon such petition the writ of *habeas corpus* was issued by the court, and was duly served upon the said Lamoreau, sheriff, to which a return was made by said sheriff, in effect that "he had the body of said Snyder before the court." And for the author-

ity and cause of the restraint of the said Snyder in his custody, he stated that—

"On December 1st 1876, John Hood made in writing, and upon oath, a complaint before A. D. Hyatt, a justice of the peace of Linn county, against the said A. J. Snyder, charging him with having, on November 25th 1876, procured $1,500 in money, and a check drawn by Snyder & Co. on Hood & Kincaids, in favor of Snyder & Co. for the sum of $1,500, upon which check the said John Hood wrote across the face, 'The First National Bank of Kansas City, Missouri, will please pay.—Hood & Kincaids,' from the firm of Hood & Kincaids, by false pretenses and with intent to defraud Hood & Kincaids; that on said December 1st said justice of the peace issued a warrant, reciting fully the alleged offense; that Snyder was arrested; that upon the preliminary examination numerous witnesses (giving their names,) testified; that the evidence taken at the examination was not reduced to writing; that upon the conclusion of the examination the justice decided an offense had been committed, and that there was probable cause to believe said Snyder guilty as charged in the complaint and warrant, and ordered that he give bail in the sum of $5,000 for his appearance at the district court of said Linn county, at the next term thereof, to answer said charge, and in default of such bail to be committed to the jail of the county of Linn; that no bail whatever was offered; that said justice of the peace then made out a written order of commitment, and gave the same to the respondent to execute; that said respondent was and is the sheriff of said Linn county, and held said Snyder in his custody as such sheriff by virtue of said order of commitment."

Copies of the complaint, warrant, and decision of the justice, are attached to the return. The original order of commitment was also produced by the sheriff on the hearing. A reply was filed to the return of the officer, stating that the testimony mentioned in the return, and the evidence given by the witnesses named, were not sufficient to authorize the magistrate to find *Snyder* probably guilty of the offense charged. Afterward, under the requirements of the court, an amended reply was filed, setting forth in detail the evidence of the prosecution before the justice.

The case was set for hearing, and was heard on the 30th of January 1877. On the hearing, the questions as to bail, and the illegality and insufficiency of the warrant of commitment, were waived, and the only allegation relied on by *Snyder* was the one contained in the petition concerning the "alleged want of probable cause." The counsel for the respondent admitted that the testimony contained in the reply set forth all the evidence admitted before the justice, excepting that purporting to have been given by John Hood, one of the witnesses for the prosecution, and a member of the firm of Hood & Kincaids. The court summoned John Hood, as a witness, and received his evidence orally.

Upon an investigation of the criminal charge preferred against *Snyder* before the justice, the facts of the case were found to be substantially as follows: During the fall of 1876, *A. J. Snyder* was engaged in buying and shipping stock under the name of Snyder & Co., and had made several shipments of stock from points along the Missouri River, Fort Scott & Gulf railroad, to D. A. Painter & Son, who were live-stock brokers and commission merchants at Kansas City, Missouri. One J. M. Shores was connected with Snyder in business. Hood & Kincaids were bankers, having a banking-house at Pleasanton, Linn county, Kansas, of which Mr. Hood was cashier and general manager. The firm of D. A. Painter & Son was composed of D. A. Painter and Charles Painter. On the 22d of November 1876, *Snyder* went to Charles Painter, the book-keeper of Painter & Son, for a letter of credit. Charles Painter thereupon wrote out a letter of credit, took it to the Mastin Bank, had it indorsed by the teller, returned to his office, and delivered the letter of credit to Snyder. Snyder looked it over and remarked that he thought there would be bother about it on account of the words, "bill of lading attached." At his request, Charles Painter wrote out another letter of credit, of which the following is a copy:

KANSAS CITY, Mo., Nov. 22, 1876.
*Messrs. Hood & Kincaids, Pleasanton, Kansas:*
DEAR SIRS: We will honor Messrs. A. J. Snyder & Co.'s

draft on us to the amount of four thousand dollars ($4,000,) to pay on live stock consigned to us.

Very truly yours, D. A. PAINTER & SON.

Snyder took this letter also, remarking that if he couldn't use the one, he would the other. Snyder then went to Pleasanton, and on the 23d he called at the banking-house of Hood & Kincaids, and presented the above letter of credit, and said he wanted to get money to buy stock with. Hood asked him what amount of currency he wanted; he answered about $2,000. Hood told him they were short in currency, but would send up to Kansas City and have some shipped down, but that they could not see to the shipping of stock. In this conversation Snyder told Hood the cattle would be shipped to Painter & Son. Snyder then telegraphed to Painter & Son, that—

"Your letter of credit says, *on stock consigned to us.* Hood & Kincaids can't go and see how consigned. Telegraph to H. & K. to erase that part. We will want some money to-morrow.          SNYDER & Co."

On the same day Painter & Son, in answer to the said dispatch, telegraphed to Hood & Kincaids—"We will honor Snyder & Co.'s drafts, *to pay on stock,* to the amount of four thousand dollars." On the 23d, or the 24th, (the witness Hood fixes the 24th as the date,) Snyder again called at the bank, and asked Hood what was the matter with the telegram—and then stated he had been to Fort Scott to get money on his draft on Painter & Son, and that the bank there had telegraphed to H. & K., and H. & K. had answered they would honor the draft on certain conditions; that he had bought the pick of a large lot of cattle, and wanted money to pay for them. Hood thinks he said about one hundred head. Snyder then stated he would send to Painter & Son and have the letter of credit modified. After this conversation, Snyder took the cars and went to Fort Scott. On the 24th, late in the afternoon, he drove out to D. G. Glasscock's, in Vernon county, Mo., nine miles northeast from Fort Scott, and about sixteen miles from Prescott. (Prescott is on the railroad, six miles south of Pleasanton.)

On the morning of the 25th, Snyder and Glasscock went out and looked at the cattle Glasscock was fattening, and Snyder made a bargain for the cattle, by the terms of which he was to take eighty head of steers at 3¼ cents per pound, 37 or 38 of them to be delivered on the next Monday, the 27th, and the balance about the middle of February. Snyder paid Glasscock $25 on the cattle, and took his receipt therefor. Glasscock also sold him his hogs, twelve or fifteen in number, and agreed to try to get up a car-load. Snyder then returned to Pleasanton, and on the same day telegraphed to Painter & Son —

"The words, *to pay on stock*, in the way. Say to Hood you will, or will not, pay. Answer quick.

"SNYDER & Co."

Painter & Son telegraphed back to Hood & Kincaids, "We will honor Snyder & Co.'s drafts to the amount of four thousand dollars." This telegram was received by Hood before Snyder called at the bank on the 25th. About noon, on the 25th, Snyder went to the bank, and asked Hood how it was "in regard to that money to-day." Hood told him that he thought everything was right now, and asked him how much money he would need. He said he thought that $3,000 would do. Snyder made a draft for the amount on D. A. Painter & Son, and Hood paid him $1,500 in currency, and a certified check on the First National Bank at Kansas City for $1,500. Hood said to him at the time, that he supposed the cattle would be shipped on Monday night. Snyder said, no; that it would take a couple of days to get them to the station; that they were about nine miles northeast of Fort Scott, and sixteen miles from Prescott. Hood remarked to him, that he ought to get them to Fort Scott in less time than that. Snyder said the cattle were to be delivered and paid for at Young's scales; that Young's scales were nearer on the road to Prescott, and that the cattle were fat and would have to be driven slow. This conversation between Hood and Snyder occurred while Hood was certifying to the check. Snyder first drew a draft for $3,000, but its terms being un-

satisfactory to Hood, in not being payable at sight, Hood made one out inserting therein "Pay to the order at sight of Hood & Kincaids," etc., and Snyder signed the firm-name of "Snyder & Co." thereto. Hood testified he believed all the representations made to him by Snyder to be true, and that he was induced to deliver to Snyder the $1,500 in currency, and the certified check of $1,500, on November 25th, upon Snyder's statement that he had enough cattle bought, and that he would ship them to Painter & Son, and believing that Painter & Son would pay his draft when the cattle were disposed of, if not before, and further, that he would pay H. & K. twenty-five cents on the $100 for exchange. Hood also testified, that at the time he delivered the money and certified check to Snyder, he did not know the financial condition of D. A. Painter & Son, and that he did not have at the time such confidence in Painter & Son as to have advanced the money obtained, on their credit alone; that he had confidence in their integrity, not in their financial ability, and his confidence in their integrity was based upon representations that had been made to him by different parties that they were respectable dealers. Snyder returned to Fort Scott. On Sunday, Snyder and Shores together went again to Glasscock's house, and called him out to the fence. Shores said: "Mr. Glasscock, we've come to see if we couldn't get you to hold these cattle another day. Our financial matters is so we can't pay for 'em to-morrow, and if it would suit you as well, we'd like for you to hold 'em another day." Glasscock rather objected to this. Then Shores said, in the presence of Snyder: "If you would rather do it, we'll have to get you to ship the cattle in your own name." Glasscock then consented to keep the cattle another day. Snyder then went to Fort Scott and engaged four cars of Ming, the agent of the Mo. R., Ft. Scott & Gulf Railroad, to be used Tuesday night for Glasscock's cattle, and others. On Monday he went to J. V. Morrison, a cattle shipper who shipped cattle over the M. K. & T. Railway, told him he had bought Glasscock's cattle, and made arrangements with him to have him

ship the cattle in his own name to St. Louis; told him to order the cars and attend to the shipping of them, and also made arrangements with him to go out to Glasscock's with him the next day.   On Monday night Snyder and Shores went to Glasscock's house, stayed over night, and Tuesday, the 28th, in the morning, they went to "cut the cattle out." Snyder selected 38 to take, and then turned the rest back. Glasscock examined the cattle turned back, and found Snyder had turned back many of the cattle he had agreed to take then, and in their place had selected cattle which were more profitable to feed.   Glasscock then insisted that if he took the cattle he had selected, he should secure him that he would take the balance.   This Snyder would not do, saying that he wasn't prepared to leave the means.   Glasscock still insisted on security, and finally Snyder said : "If you can't do better than what you proposed, I'll have to let the trade fall back;" and Snyder and Shores then drove off.   The cattle selected would weigh about 1100 pounds, and the 38 head selected, at 3¼ cents, would amount to $1,358.50.   At the feed-gate they met Morrison, and told him that the trade was "busted up;" wanted him "to go and buy the cattle, if he could—they would have nothing more to do with them."   At Fort Scott Snyder saw Ming, "told him he could not ship, and withdrew his order for cars."   They then got on the freight train of which Chas. Sykes was conductor, and left Fort Scott about 1:30 P.M. Snyder paid his fare, first to Prescott, and then from Prescott to Pleasanton.   The train stopped at Pleasanton about fifteen minutes.   Snyder and Shores got out of the caboose.   Snyder went to Hood & Kincaids' bank, and told Hood that he wanted some more money to finish paying for the stock he had bought; that he was in very much of a hurry; that there was a freight train at the depot ready to pull out, and that he wanted to get back to Prescott on it.   Hood asked him how much more money he wanted.   He said $850, and gave a draft on D. A. Painter & Son for the $850, in form similar to the $3,000 draft, and Hood gave Snyder a certified check for the amount.   Snyder then tried to get on the pay

car going north; (Prescott is south of Pleasanton;) could not get on it, and then got on to Sykes' caboose again; showed Sykes a large amount of money; rode with him to Kansas City. At nine o'clock, on the 29th, he got the $850 check cashed at Wyandotte, at the banking-house of Northrup & Son. The $3,000 draft in favor of Hood & Kincaids was sent to Kansas City, and Painter & Son being unable to pay the same, it was protested. On the 29th, D. A. Painter went to Wyandotte to see Snyder and Shores, and asked them what luck they had buying cattle. They stated that they had bargained for Glasscock's cattle; that Glasscock had disagreed with them about the selection of the cattle, and would not let them have the cattle. Painter said a $3,000 draft had come on, and they had been forced to let it go to protest. Painter, Snyder and Shores then went to a saloon, where they had further talk about the $3,000 draft. Painter insisted that if they hadn't bought any stock, they must have the money; that the money ought to go to pay the draft. Snyder replied they were not going to commit themselves; that they were awaiting developments. Painter suggested that if they were keeping the money for what his firm were owing them, that he would pay them on Friday; they replied that were not going to commit themselves. After Snyder was arrested on this charge, he said to one James Reynolds, "that they had put about $3,000 in Painter's hands last spring, and he didn't like the way things were going lately; he said he hadn't lost anything, only $700 or $800." Reynolds also testified, "I can't say whether Snyder said that he had got even with him, and was going to keep even with him, or whether he said he had taken this plan to get even with him." While on his way back to Pleasanton, after his arrest, Snyder said to McGlothlin, the deputy-sheriff who had him in charge, that Painter & Son owed him $3,900; that he did this to get his money, or that it was the only way he had to get his money out of Painter & Son. While in the jail at Mound City, he made a similar statement to Robert Fleming. He also said he didn't care who H. & K. looked to for their money; that he was studying his own

case. Painter & Son owed Snyder & Shores at this time from $500 to $700, and were able to pay that, but were not able to pay the $3,850 without the cattle. They were persons of limited means. Neither Snyder, nor A. J. Snyder & Co., had any money on deposit with Hood & Kincaids at the time of these transactions, and Hood & Kincaids have never been paid any part of the $3,850.

The foregoing statement of facts was prepared by the Chief Justice. Counsel appearing for *Snyder* in this court, were *J. D. Snoddy*, *A. F. Ely*, and *W. J. Buchan*. Counsel for respondent Lamoreux, were *Stephen H. Allen* and *W. R. Biddle*. The case was argued orally by Messrs. *Snoddy* and *Ely*, for petitioner, and Messrs. *Allen* and *Biddle* for respondent. An order for the release of the petitioner was made and issued on the 9th of February.

The opinion of the court was delivered by

HORTON, C. J.: The questions presented in the case for our consideration will be disposed of by us in the order in which they were raised. After the return of the sheriff had been made, and the reply thereto filed, the counsel for the respondent objected to the summoning of the prosecuting witness, and asked that the petitioner be remanded to the custody of the officer, as it appeared from the record that, upon complaint made that a criminal offense had been committed, a warrant describing the offense had been issued, the prisoner arrested, a preliminary examination duly had before the proper officer, and a finding made that the petitioner was guilty as charged in the complaint and warrant; that thereon bail had been fixed at $5,000; that the petitioner had not offered any bail, and had been legally committed for trial, and no question was made on account of any defect in the 1. Power of court, charge, or process. Under § 671 of the code, or judge: practice. (ch. 80, Gen. Stat. 763,) it is expressly provided, that no court or judge shall inquire into the illegality of any judgment or process whereby the party is in custody, or dis-

charge him, when the term of commitment has not expired, when the party is in custody upon any process issued on any final judgment of a court of competent jurisdiction, or upon a warrant or commitment issued from the district court, or any other court of competent jurisdiction, upon an indictment or information." An order of commitment to hold a prisoner for trial, issued by a magistrate before whom a person is brought for examination, upon a charge of having committed an offense, after such examination is concluded, and a finding made that it appears that the prisoner is guilty as charged in the complaint and warrant, is not "a process issued on any *final judgment* of a court of competent jurisdiction;" nor is such a commitment included in any process named in § 671 of the code. Hence, there is no prohibition in said section to prevent a court or judge from inquiring into the legality of the imprisonment of a person under a commitment of an examining magistrate.

Sec. 672 of the code, (Gen. Stat. 1868, 763,) provides: "No person shall be discharged from an order of commitment issued by any judicial or peace officer for want of bail, or in cases not bailable, on account of any defect in the charge or process, or for alleged want of probable cause; but in all such cases, the court or judge shall summon the prosecuting witnesses, investigate the criminal charge, and discharge, let to bail, or recommit the prisoner, as may be just and legal, and recognize witnesses when proper." Under this section we hold that when a writ of *habeas corpus* issues on a complaint of illegal imprisonment, for alleged want of probable cause, the judge or court issuing the writ may, even in cases where there is no defect in the charge or process, summon the prosecuting witness, investigate the criminal charge, and discharge, let to bail, or recommit the prisoner, as may be just and legal. This section gives a party committed for a crime by an examining magistrate an appeal from his commitment by virtue of the writ of *habeas corpus*. *The People v. Tompkins*, 1 Parker's (N. Y.) Crim. Rep. 224, 240. Upon this ground the court overruled the objection to the hearing of evidence in the case,

and the motion to remand upon the record. But the court ordered, on its own motion, that the petitioner should amend his reply by setting out therein as fully and specifically as possible the testimony given by the various witnesses before the examining magistrate, and named in the return of the sheriff. The better practice is, where a petition is presented for a writ of *habeas corpus*, for alleged want of probable cause, to embody in the petition all the testimony taken before the examining magistrate. When this evidence has been reduced to writing by the magistrate, or under his direction, a copy thereof should be obtained, with the certificate of the magistrate thereto. When such testimony is not reduced to writing, there usually is but little difficulty in setting out the material and important matters testified to.

Upon the hearing of the case on the merits, the petitioner objected to the witness John Hood testifying that he was induced to part with the $1,500, and the certified check, on the statements and representations of Snyder, on the ground that it was incompetent, and was calling for the secret, mental emotions of the witness. The objection was not well taken. This was a material fact to be established. It was proper for this court to know what influence the representations of Snyder had upon the witness. If they had none at all, the prosecution must have failed. "The fact was sought after, and not the opinion of the witness." *People v. Herrick*, 13 Wend. 87; *People v. Sully*, 5 Parker's (N. Y.) Cr. Rep. 142; *People v. Miller*, 2 Parker's (N. Y.) Cr. Rep. 197; *Thomas v. The People*, 34 N. Y. 351. Objections were also taken to Hood's testimony that he believed the representations made to him by Snyder on the 23d, 24th, 25th, and 28th of November. The objections were overruled, and for the reasons above stated, we think the evidence competent. It is indispensable to the consummation of the crime of obtaining money or property under false pretenses, that the person who has been induced to part with his money or property thereby must believe the pretense is true, and, confiding in its truth, must by rea-

36—17 KAS.

2. False pretenses; belief of injured party; competency to testify.

son of such confidence have been cheated and defrauded. We do not mean by this ruling that such evidence is the best, nor the most reliable; nor that it is necessary for the prosecutor to state he believed and relied upon the pretense. All of this may be inferred. We simply hold the evidence admissible.

The material question however in this case, is, whether on the evidence submitted to us an offense is made out against Snyder for false pretense, within the statute, in his obtaining from Hood & Kincaids, on November 25th, the $1,500 in currency, and the certified check of $1,500. The counsel for the petitioner contended that there was no evidence of the procuring of the money or check by any false pretense. *First:* Inasmuch as Hood, at the time he let Snyder have the money and check on the 25th of November had an absolute order in the form of a telegram from Painter & Son to honor Snyder & Co.'s drafts for four thousand dollars, and had previously refused to pay the money on a letter of credit, which he construed as requiring him to see to the shipping of the stock to Painter & Son, it is conclusively shown that such telegraphic order of Painter & Son was the sole inducement by which the money and check were parted with by Hood. *Second:* That the representation made by Snyder to Hood, that he had bought the pick of a large lot of cattle, about 100 head, was true on the said 25th, when the money and check were obtained; and that the statement that the cattle would be shipped to Painter & Son at Kansas City, was a representation or assurance in relation to a future transaction, and did not amount to a statutory false pretense. As to the first proposition of counsel of the petitioner for his discharge, we answer, that we are not satisfied that Hood parted with the money and check solely on the telegram of credit of the 25th. The testimony tends to show that he was induced to part with the property in controversy, partly on that telegram, partly on the representation of Snyder that he had bought about 100 head of cattle, and partly on the statement that he would ship the cattle to Painter & Son. In an

3. What constitutes false pretenses.

examination of this character, we are not to pass absolutely on the guilt or innocence of the prisoner: if we shall find an offense has been committed, and there is probable cause to believe the prisoner guilty thereof, the prisoner should be committed for trial. As different motives were assigned by the prosecutor as operative in producing the delivery of the money and check to Snyder, the examining magistrate, and this court, is only to ascertain that there is probable cause to believe that the pretenses proved to have been false and fraudulent, if within the statute, were a part of the moving causes which induced Hood to part with the property, and that Snyder would not have obtained the same if the false pretense had not been superadded to the telegraphic order of Painter & Son of November 25th, to authorize the holding of Snyder for trial. It is not necessary, to constitute the offense of obtaining goods by false pretenses, that the owner should have been induced to part with his property solely and entirely by pretenses which were false; nor need the pretenses be the paramount cause of the delivery. It is sufficient, if they are a part of the moving cause, and without them the prosecutor would not have parted with the property. *People v. Haynes*, 14 Wend. 547.

This leads us to examine the second proposition upon which the counsel for the petitioner claims his release, and to consider the representations made by Snyder, "that he had bought

4. What false pretense is not within the statute.

the pick of a large lot of cattle, about 100 head," and that "he would ship them to Painter & Son." The first representation was substantially true when the money and check were obtained on the 25th of November. At that time the cattle had been contracted for by Snyder with Glasscock, and a part of the consideration paid. This representation when made on the 23d, or 24th, of November, was false. On the 25th, it had become true. Is a pretense, which was false when made, within the statute, if true when the property is parted with? We think not. The pretense employed is only the means by which the offense is perpetrated. The substance of the offense consists in the

obtaining of the property, and thereby with a fraudulent intent depriving the lawful owner of that which properly belongs to him. If a party by his own acts makes the false representations good, before obtaining the property, there is no consummation of the crime; and there is no criminal attempt, for it follows, that, when there is a change of purpose on the part of a person seeking to obtain property by a false pretense, before any other wrongful act is committed than the making of the false pretense, the crime of the attempt is taken away. The fact that in this case, Snyder never abandoned the scheme to defraud some one, does not militate against the conclusion, that the pretense must be false in fact when the property is parted with. How can it be said that Hood relied upon a *false* representation as to the purchase of the cattle when he delivered the money and check, if at that time the representation had become *true?* No property was parted with by Hood on the 23d, or 24th. The representation then made by Snyder as to buying the cattle, was true, on the 25th, and before he obtained the money, or check; and if he is to be held for the commission of a crime by obtaining property under false pretenses, it must be upon some other representation than the representation on the 23d, or 24th, as to having "bought the pick of a large lot of cattle."

As to the representation of Snyder, "that he *would* ship the cattle to Painter & Son at Kansas City," we follow authority in holding such statement is not a statutory false pretense. The false pretense relied upon to constitute an offense under the statute, must relate to a past event, or to some present existing fact, and not to something to happen in the future. A mere promise is not sufficient. *Rex v. Young*, 3 Term R. 98; *Rex v. Lee*, L. & C. 309; *Commonwealth v. Drew*, 19 Pick. 179; *State v. Evers*, 49 Mo. 542; *Dillingham v. State*, 5 Ohio St. 280; *Burrow v. State*, 12 Ark. 65; *State v. Magee*, 11 Ind. 154; *The State v. Green*, 7 Wis. 676. The representation that the cattle *would be* shipped to Painter & Son, related to an event which was thereafter to happen. It was a promise or assur-

5. False pretense must be as to past, or present facts.

ance, of a future transaction. Upon the evidence, we are therefore compelled to say, that as the only offense charged in the complaint, and in the warrant against Snyder, was the obtaining of the $1,500 in currency, and the certified check of $1,500 on November 25th, as 'therein stated, and as the order of commitment was issued on the finding of the examining magistrate, that there was probable cause to believe Snyder "guilty as charged in the complaint and warrant," there is no legal authority for holding the petitioner in custody, and he must be discharged. It is perhaps unnecessary to add, that in point of moral turpitude Snyder is as guilty in obtaining the property of Hood & Kincaids on the 25th of November on a false promise, if such be the fact, as if such pretense was within the statute. The criminal law however cannot reach the perpetrator of every fraud. "The statute may not regard naked lies as false pretenses." It has been well said, "The operation of the wisest laws is imperfect and precarious; they seldom inspire virtue; they cannot always restrain vice; their power is insufficient to prohibit all that they condemn, nor can they always punish the actions which they prohibit." We have intentionally abstained from commenting upon the transactions of the 28th of November, when Snyder is alleged to have obtained a certified check of $850, because there is nothing in the proceedings before the magistrate, or in this court, to prevent the petitioner from being arrested, if any complaint is made, therefor. Whether a crime has been committed in that regard, and whether there is probable cause to believe the petitioner guilty thereof, may be a matter of future examination and judicial determination. In this investigation, the testimony of facts, subsequent to the 25th, was received by us only to explain the transactions of the 25th of November, and to shed light upon the intent of Snyder.

That the force of this decision may not be misconstrued, we may properly say, that the evidence shows there was no collusion between the firm of Painter & Son, and Snyder, and that the purchase of the cattle by Snyder of Glasscock

on the morning of the 25th was made in good faith.   It is evident however, that Snyder never intended to ship any of the cattle to Painter & Son, and all his statements to that effect were in pursuance of his scheme to successfully carry out his fraudulent purpose.

Let the petitioner be discharged.

All the Justices concurring.