[Opinion delivered March 13, 1886.]

[No. 2044.]

## A. Blum v. The State.

1. Swindling, as defined by article 790 of the Penal Code of this State, comprehends four elements, all of which must concur in order to constitute the offense. First, there must be an intent to defraud. Second, there must be an actual act of fraud committed. Third, false pretenses must have been made by the accused. Fourth, the fraud must have been accomplished by means of the false pretenses made use of for the purpose.

2. Same.— A False Pretense consists of a statement of some pretended existing fact, made for the purpose of inducing the owner to part with his goods. No statement of anything to take place in future is a pretense within the meaning of the Code. A false pretext, however, may be implied from the acts and conduct of the party without any verbal representation of a false or fraudulent nature. See the opinion *in extenso* on the subject.

3. SAME — PRINCIPAL OFFENDERS.— If two or more persons are jointly indicted for obtaining goods by false pretenses, made designedly and with intent to defraud, evidence that one of them, with the knowledge, approbation, concurrence and direction of the other, made the false pretenses charged warrants the conviction of both.

4. SAME — INDICTMENT.— See the opinion *in extenso* for the substance of an indictment *held* insufficient to charge the offense of swindling by obtaining goods under false pretenses.

5. SAME — EVIDENCE.— See the statement of the case for evidence *held* insufficient to support a conviction for swindling.

APPEAL from the District Court of Navarro. Tried below before the Hon. L. D. Bradley.

The conviction in this case was for swindling one R. P. Goodman in Navarro county, Texas, on the 21st day of December, 1885, in the manner set out in the indictment, the substance of which is stated in the opinion. A term of two years in the penitentiary was the penalty assessed.

R. P. Goodman was the first witness for the State. He testified that, on the 21st day of December, 1885, and for several years prior thereto, he had been engaged in the grocery mercantile business in Corsicana, Texas. The defendant at that time had been more than a year engaged in conducting a grocery and bakery establishment known as the "Star Bakery," in the said town of Corsicana. He retailed general family groceries, and ran a bakery in connection with his grocery business. For more than a year he had conducted his business under his own name, and held himself out to the public generally as the owner of the establishment. During the year mentioned, the witness had many business dealings with the defendant, and frequently sold him goods on time. The defendant, always, in the course of those dealings, represented to the witness that he was the owner of the establishment over which he presided, and was running it under his own name. On the said December 21, 1885, witness, still believing the defendant to be the owner and proprietor of the establishment known as the Star Bakery, sold the defendant an invoice of groceries. The belief that defendant was the owner and proprietor of the business in which he was engaged, under which belief the witness sold the goods on the said December 21, 1885, was superinduced by the defendant's former dealings with him, in the course of which the defendant always represented to the witness that he was the owner and proprietor of the said business. But for the belief that the defendant was, in fact, the actual owner and proprietor of the Star Bakery, and its retail grocery adjunct,

the witness would not have sold any goods to the defendant on credit. During the day charged in the indictment, the witness sold and delivered to the defendant one thousand pounds of flour of the value of $26; two sacks of coffee of the value of $13 or $14 each; two cheeses of the value of $6; eleven sacks of salt and a barrel of apples, the said goods worth in the aggregate about $90. The goods described were sold between the hours of 9 o'clock A. M. and 4 o'clock P. M. Defendant once or twice sent his boy to witness's store to expedite the delivery of the goods. Witness did not know the exact hour on which the goods were delivered. They were delivered by the witness's drayman, Henry Thompson. Some of the goods described were ordered through the little negro boy who worked for the defendant, and some of them through Mr. Rich, the defendant's father-in-law. The goods described were of the kind that the defendant usually bought from the witness, but defendant had never before bought so large a quantity.

Cross-examined, the witness testified that he sold the goods to the defendant at current prices. The goods sold to the defendant belonged to the firm of R. P. Goodman & Co., of which firm the witness was the sole member. The defendant was not in the witness's store in person on that day. Witness did not solicit the defendant's order on that day, and did not know whether or not his clerk did. That clerk was not present upon this trial. When the witness sold and delivered the goods to the defendant, on the said December 21, 1885, he did not know that the establishment known as the " Star Bakery " and its retail grocery adjunct had been that day conveyed to defendant's wife, Mrs. Carrie Blum, and her daughter, Eulalie O'Daniel, nor that the said transfer had been recorded on that day. The witness discovered the record of the said transfer on the next day, and went to the Star Bakery establishment, but could not identify the articles he sold the defendant on the day before. Witness saw sacks of flour which looked like the goods he had sold, but was unable to identify them. The coffee had been emptied from the sacks, and all of the goods were then under attachments sued out and levied by other parties. It was the understanding and belief of the witness that the defendant owned the business he was conducting.

Henry Thompson, the next witness for the State, testified that, on December 21, 1885, he was in the employ of Mr. Goodman as drayman, and delivered an invoice of flour to the defendant on that day. The witness was hurried in his delivery of the flour by the defendant's boy. He delivered the last load of flour to defendant

just after 12 o'clock. When he delivered the first load, defendant sent by him for samples of coffee, which witness brought back with the last load, and told him that Mr. Goodman said that he could sell such coffee at ten and three-fourths cents per pound. Defendant cursed and said that he could buy it cheaper of Allen. Later in the day, however, he sent Mr. Rich to Goodman's store and ordered two sacks of the coffee and two cheeses, which the witness delivered about 4 o'clock P. M. The salt, etc., was delivered later by some one else. Blum's boy put the flour in a rack, and the coffee, by Blum's order, was emptied into barrels.

Frank S. Kerr was the next witness for the State. He testified that, in December, 1885, he was the deputy county clerk of Navarro county. About noon, on the 21st day of that month, the defendant and Isaac Rich came to the clerk's office, with a bill of sale from defendant to his wife and step-daughter, conveying the bakery and grocery business hitherto conducted by the defendant as the "Star Bakery." The defendant acknowledged the execution of the instrument, and filed it for record at exactly 12 o'clock. Late on the same evening, when witness was passing the bakery, defendant called him and requested him to say nothing about the execution and record of the instrument. He said that the transaction was thoroughly fair, honest and legitimate, but some business men might conclude that it indicated something wrong, and such things frequently injured one's credit. He asked witness to let the business men find the matter out for themselves.

Cross-examined, the witness said that he did not read the instrument to the defendant. He merely took the defendant's acknowledgment, and recorded the instrument. Mrs. Blum took out letters of guardianship of her daughter, Eulalie O'Daniel. She gave her father, Isaac Rich, and P. McCamman as sureties on her bond. She was still acting as the guardian of Miss Eulalie O'Daniel. Defendant said that he acknowledged signing the transfer for the purposes and considerations it expressed. Defendant got the original paper a few days afterwards. At this point the instrument referred to was, by certified copy, introduced and read in evidence by the State. It is as follows:

"THE STATE OF TEXAS, }
  *County of Navarro.* }

"Know all men by these presents that I, August Blum, of the State of Texas, and county of Navarro, for and in consideration of the sum of $846 to me in hand paid by my wife, Carrie Blum, and my step-daughter, Ula Lee O'Daniel, this being the separate estate

of my wife from the estate of her first marriage, and the property of Ula Lee O'Daniel from the estate of her father, have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey to Carrie Blum and Ula Lee O'Daniel, all my right, title and interest in and to my grocery and bakery business, situated in the city of Corsicana, Navarro county, Texas, on the corner of Jefferson and Bois d' Arc streets. This conveyance is intended to include all the goods that I have on hand of every description, consisting of a general line of groceries and baker's business, and are in the brick building situated on the corner of the streets above mentioned. · The business in the said brick building will be carried on hereafter in the name of Carrie Blum and Ula Lee O'Daniel. This conveyance also includes one horse and delivery wagon that I am now using. The half interest in the property hereby conveyed to my wife, Carrie Blum, is to be her separate property, together with all and singular the good name which I have established with said business, and all rights and interests in any way belonging, to Mrs. Carrie Blum and Ula Lee O'Daniel, their heirs and assigns forever. And I do hereby bind myself, my heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Carrie Blum and Ula Lee O'Daniel, their heirs and assigns, against every person whomsoever, lawfully claiming or to claim the same or any part thereof.

" *Witness*, my hand at Corsicana, this the 21st day of December, 1885.    .    .    A. Blum."

" The State of Texas, �months
 *County of Navarro.*  ⎭

" Before me, S. H. Kerr, clerk of the county court of Navarro county, Texas, on this day personally appeared A. Blum, to me well known to be the person whose name is subscribed to the above and foregoing instrument of writing, and acknowledged to me that he signed and executed the same for the purposes and considerations therein expressed.

" Given under my hand and seal of office, this 21st day of December, A. D. 1885.    S. H. Kerr,

" Clerk Co. Ct. Navarro Co., Texas.

" By F. S. Kerr, Deputy."

" The State of Texas, ⎱
 *County of Navarro.*  ⎰

" I, S. H. Kerr, clerk of the county court of Navarro county, Texas, do hereby certify that the foregoing is a true copy of the original bill of sale, filed for record in my office at 12 o'clock, M.,

December 21, 1885, and duly recorded at 11 o'clock A. M., December 23, 1885.

"Given under my hand the day and date last above mentioned.

"S. H. KERR, C. C. C. N. C.

"By S. M. KERR, Deputy."

C. W. Jester was the next witness for the State. He testified that about the middle of the afternoon of December 21, 1885, young Ben Rich came to him and bought a set of single, and the half of a double set of harness from him. Witness went to see defendant about the transaction later in the evening. Defendant said that he wanted the harness to run a single and a double delivery wagon in connection with his bakery, and would pay for it on the first of the next month. Witness recovered all of the harness except a hitch rein. When young Rich came to the witness's store, he said that defendant was going to enlarge his business and run the two wagons, and that he wanted to purchase the harness for the defendant. He said that he wanted a single set, and the half of a double set to match a half set that he had. Witness told young Rich to bring the half set he had to the store, so that it could be better matched. Rich, however, declined, and selected a half set which he took off. Witness heard of the transfer on the next morning, and went to see defendant about the transaction. The defendant made the statement to witness as above related, promising to pay for the harness on the first of the ensuing month. Witness, however, preferred taking no chances, and accordingly resumed possession of his property. The purchase of the harness was transacted without the least difference about prices. Defendant had previously conducted his bakery and grocery business in his own name and as owner and proprietor, and so held himself out to the public.

R. Le Beau testified, for the State, that his wife sent for him to come to their establishment on the 21st day of December, 1885. When he arrived he found a lot of goods, aggregating $56 in value, set apart for the defendant's wife. The witness knew nothing of his own knowledge concerning the purchase. When Isaac Rich and Mrs. Blum presently came to get the goods, witness told Rich, who came into the store after them, that he could not get them without the money. Mrs. Blum then said that if she had known as much she would have brought the money with her. She then sprang out of the buggy and gave witness's wife the hat she had on, which she wore off when at the store at the time of making the purchases.

B. H. Woods testified, for the State, that he was a clerk in the

store of J. T. Sullivan & Co. in December, 1885.   On the 21st day of that month Mrs. Blum and Isaac Rich came to the store and Mrs. Blum purchased boots and shoes to the value of $32, which was largely in excess of any previous bill that had been sold to defendant on credit.   Mrs. Blum directed that the goods should be charged to the defendant, payable on the 1st of January.   The goods purchased comprised three pairs of boots, two pairs of ladies' shoes, and several pairs of children's shoes.   Shoes had been previously sold to Mrs. Blum on credit, and defendant had always paid. It was a frequent custom of the firm to send out several pairs of shoes or boots, to be tried and selected from, charging all, and giving credit for those returned.   In this instance the sale was complete and comprehended all of the articles.   The transaction occurred about 3 o'clock.   Witness heard of the transfer later in the evening, and went immediately to the defendant's house and recovered the boots and shoes.   Witness explained that Mr. Sullivan was absent, and that he could not assume the responsibility of extending credit. The witness had known the defendant as the proprietor of the bakery and grocery in his charge for more than a year.   In all of his dealings with the firm of J. T. Sullivan & Co., and in all of his intercourse with the general public during that time, the defendant held himself out as the owner of the business.   At the time that he sold Mrs. Blum the bill of boots and shoes, the witness did not know of the existence of the transfer of the property from defendant to his wife.

J. Baum testified, for the State, that on the 21st day of December, 1885, defendant's negro boy came to witness's establishment with word from defendant to send him a tierce of lard.   Witness was out of lard and sent word to that effect to defendant.   Defendant was then in debt to the witness.   Witness sued out an attachment against the defendant's property, and went to see defendant. Defendant, on the day witness levied the attachment but before the levy, told witness that he had money but would not pay witness,— that he was not as green as he once was, and would save his money to pay lawyers.

Cross-examined, the witness stated that defendant's previous purchases from him had been about four times in excess of his payments.   His last payment, on the month before the attachment, was about fifty dollars on a debt of about three hundred.

Nathan Kahn testified, for the State, that on the 21st day of December, 1885, he sold Mrs. Blum and Isaac Rich $170.30 worth of dry goods out of the store of Kausler Brothers, for whom witness

was clerking, and by request of Mrs. Blum and Mr. Rich charged them to the defendant. This was between 3 and 5 o'clock in the evening. Between 7 and 8 o'clock on that night, the record of the transfer of his business by defendant to his wife was reported at the store, and Mr. Stern went to defendant's house and got the goods back. Goods had been previously sold to the defendant and his wife on credit, but never, at any one time, to such a large amount. The goods were sold outright, and nothing was said about returning any of them.

Morris Fox testified, for the State, that Mrs. Blum and Mr. Rich came to his store late on the evening of December 21, 1885, and bought $137 worth of goods to be charged to defendant. Purden, an employee in the store, went to see defendant and demanded an advance of $100 on the goods, which not being paid, the goods were not delivered.

Moses Stern testified, for the State, that while Mrs. Blum and Mr. Rich were in Kausler Brothers' store, purchasing the bill of goods mentioned by the witness Kahn, witness went to see the defendant about the proposed purchase. Defendant said simply: "If it is not all right, don't let them have the goods." The goods were delivered, but witness went to defendant's house on that same night and got them back. When witness went to see defendant, he told witness that he sent Mrs. Blum and Rich to buy the goods, but if witness did not want to let them have the goods, not to do it; that he had always paid his bills and would pay that one on the 1st of the month. That conversation took place while Mrs. Blum and Rich were selecting the goods, which were afterwards delivered. When witness heard of the transfer, later on that evening, he went back to defendant and demanded either the goods or the money. Defendant did not want to return the goods nor to pay for them, but finally gave up the goods.

J. F. Stout testified that he was an attorney-at-law, practicing in Corsicana, Navarro county, Texas. Isaac Rich and his daughter, Mrs. Blum, came to witness's office on the 21st day of December, 1885, and Mrs. Blum told witness that her husband had long been in her debt, and that she wanted him to secure her in some way. She then asked witness to write out for her a transfer or other instrument that would protect her and her child. She represented to the witness that she had a child by her former husband, Mr. O'Daniel, who, at his death, left her a small amount of money, and that since his death other amounts had been sent her from North Carolina from O'Daniel's estate, for the child, of whom she was

guardian; that she had put all of that money in defendant's hands, and that he had been operating with it for some time, and that she had no showing for it. The different amounts, as stated by Mrs. Blum, aggregated $1,846, the amount stated in the bill of sale (?). Witness then drew up the instrument as it reads of record. Defendant was not present, and never at any time spoke to the witness about the matter. Mrs. Blum's purpose, as she expressed it, was to secure herself in the sums she had advanced the defendant. She said that defendant at that time was willing to secure her, and she wanted the matter attended to speedily, before he changed his mind. Witness told Mrs. Blum that, according to her statement, part of the funds she had described belonged to her and part to her daughter, and that the transfer should be drawn to secure both. Witness then drew up the bill of sale.

Cross-examined, witness testified that nothing was said in his conference with Mrs. Blum about a mortgage. Mrs. Blum's idea was to get a transfer of the business to herself and her daughter. Witness explained to her that the business would have to be conducted henceforth in the names of herself and daughter. She said that her husband had consented to sign the transfer, and that she wanted it written before he changed his mind.

Mrs. Carrie Blum testified, for the defense, that she had been married to the defendant about three years. Her former husband was Mr. O'Daniel, from whose estate she and her daughter Eula got about $1,846, including $250 which she got from North Carolina, as the guardian of her daughter; all of which money she invested with the defendant in the bakery business. On the morning of December 21, 1885, the witness's father, Mr. Rich, came to town and witness got him to go with her to Stout's office, to get an instrument drawn up securing her and her daughter with the bakery and grocery business. Stout said that he would draw up a legal document to cover the case. He drew up the instrument and read it to the witness, but witness paid but little attention to it. Witness took the document to the defendant, and defendant took it to Mr. Kerr for the purpose of having it recorded. Mr. Rich went with defendant to Kerr's office. Witness had been vainly trying for some time to get defendant to secure her with some kind of a legal claim on the establishment. On Sunday morning, December 20, 1885, defendant consented to sign such a document. On the very next morning witness went to Stout's office and had the instrument drawn up. She got back home from Stout's office at about 12 o'clock, M. The defendant, if disposed, could have paid the witness some

money, but he said that he wanted such money as he had to pay his debts and run his business. Stout did not tell the witness that the business would have to be run in her and Eulalie's names, after the execution of the transfer.

On the morning of December 21, 1885, Joe Goodman, R. P. Goodman's clerk, came to the establishment of the defendant, soliciting trade with Mr. R. P. Goodman. Defendant bought some flour from him. On the return of witness and Mr. Rich from Stout's office, defendant sent Rich to Goodman's store to select the coffee, Mr. Rich being a good judge of that article, and to direct Goodman to deliver the other goods he had ordered by the negro who delivered the flour. Witness did not, because she was unable to, read to defendant the instrument drawn up by Stout. The defendant did not read it, because he could not read English. If anybody read the instrument to the defendant, the witness did not know it. Defendant took the document to the court-house. A number of articles of goods were needed because of the approaching marriage of the witness's sister, and defendant told witness to go to the stores down town, buy them, and have them charged to him. That was on the evening of December 21, 1885. Witness and her father, Mr. Rich, went down town together. They stopped at Le Beau's but bought nothing there, because the goods were too expensive. Witness did not select any goods at Le Beau's and have them laid aside. She did not buy a hat at Le Beau's and wear it away. She selected a few goods at Fox's, but they were not sent to the house. She bought some goods from Kausler Brothers, and they were sent to the house, but Mr. Stern came to the house and took them away, saying that he was going to have witness and defendant arrested. At Sullivan's the witness got some shoes for herself and her children, and Mr. Rich got some boots for defendant and for the driver of the bread wagon. None of the goods were for Mr. Rich. More pairs of boots and shoes were taken home than it was designed to keep, the purpose being to select and keep those of them that fitted, and return the others. Defendant at that time owed Mr. Rich about $50. He had frequently owed Mr. Rich small amounts, and often gave Rich orders for goods in payment. Defendant and Rich were not on very good terms. The goods purchased from Goodman were placed in the bakery just where such goods were generally kept. Defendant's purchases were generally made on credit, payable on the first of the ensuing month. He was never refused credit.

Cross-examined, the witness stated that she said nothing to the

defendant about having the legal document drawn up, on the morning of December 21st, until she returned with it, gave it to him, and he took it to the court-house to have it recorded. Defendant told witness to have what goods she bought in the morning charged to him. The witness bought nothing at Le Beau's, and had nothing laid aside there, though she selected about $10 worth. She bought no suits at Fox's, but did choose one overcoat. A large part of the goods designated by witness at Fox's were to be selected from at home. She selected two overcoats at Kausler's, one of which, and much of the balance of the goods ordered at Kausler's, were to be returned after selections were made. At Le Beau's witness selected $8 or $10 worth; at Fox's not exceeding $50; at Kausler's between $60 and $100. She did not know the value of the goods she selected at Sullivan's. Defendant had money, and could have paid the witness's demand if he had wanted to. He had more than $500, and ample to pay his debts. Witness did not know the value of the goods he had in stock on December 21, 1885. Le Beau told witness that he did not sell goods on credit, and witness did not get the goods she selected at his establishment. She did not get a hat at Le Beau's and wear it away, leaving her old one at the store. Defendant did not know where witness had gone when she went to Stout's office to get the paper drawn up.

Isaac Rich testified, for the defense, that he was the father of the defendant's wife. Witness came to town on the morning of December 21, 1885, and was requested by his daughter to escort her to Mr. Stout's law office for the purpose of having a legal document of some kind drawn up to secure her for the money she had advanced to the defendant in the conduct of his business. Stout drew up a paper which he gave Mrs. Blum. Mrs. Blum gave the paper to witness and witness took it to Frank Kerr for record. Kerr said that the paper would have to be signed by the defendant. Witness went after the defendant, who returned with him to the court-house and signed and acknowledged the paper, and left it with Kerr to be recorded. After 12 o'clock on the same day, the witness, at defendant's request, went to Goodman's store and had the goods he had ordered sent to the bakery.

Cross-examined, the witness testified that when Kerr told him that the paper would have to be signed before it could be recorded, he went to Blum and told him that the paper was filed, but that Kerr had said that his signature was necessary before it could be recorded. The witness did not know what was in the paper and neither did defendant know. Witness was unable to read the paper,

and defendant, who was a German, could not read English. Nothing was said in Stout's office about the business having to be run after the execution of the paper, in another than in the defendant's name, or that it would have to be run in Mrs. Blum's and her daughter's names. Defendant had between $2,500 and $3,000 worth of goods in his bakery and grocery store on the evening of December 21, 1885. Mrs. Blum and witness went to the stores in town to purchase some goods in anticipation of the wedding of witness's daughter, Mrs. Blum's sister. The witness did not know to whom the goods thus purchased were to be charged. Witness got two pairs of boots for his son who was driving defendant's delivery wagon. Witness tried those boots on, because he and his son wore the same number of boots or shoes. He got also one pair of boots for the defendant. Defendant, at the time of these transactions, owed the witness about $50. Some goods were purchased at Le Beau's, but when witness and Mrs. Blum called for them, Le Beau would not deliver them because, he said, he did not sell goods on credit. Mrs. Blum did not leave a hat at Le Beau's which she had previously worn away.

The defense next introduced the minutes of the probate court of Navarro county, showing the application of Mrs. Carrie O'Daniel to be appointed guardian of the minor Eulalie O'Daniel; her appointment as such guardian; her official bond, and an order of court to sell certain real estate in Chatham county, North Carolina, for the benefit of the estate of the said minor. The case for the defense was closed by introducing in evidence the writ of attachment and the sheriff's inventory in the case of *Cohen* v. *Blum*, in the county court, which said writ of attachment was levied on December 25, 1885, on groceries, flour and salt, including the Goodman goods, amounting in the aggregate to $518. This levy was made upon all goods in the establishment subject to former levies, the first of which was made on December 22, 1885.

M. Fox was recalled by the State in rebuttal. He produced a bill of goods bought by Mrs. Blum, at his store, on December 21, 1885, amounting in the aggregate to $135.70, including "one suit of clothes, $18.50." The witness stated that the goods were to be charged to the defendant and none of them were to be returned.

Mrs. Le Beau testified for the State, in rebuttal, that Mrs. Blum came to her establishment on the morning of December 21, 1885, and selected $54.45 worth of goods to be charged to defendant. Witness sent for her husband after Mrs. Blum left, and before sending the goods to defendant's house. Mr. Le Beau declined to let

the goods go on credit. On her return for the goods, when she was told that the goods would not be delivered on credit, Mrs. Blum gave back a $6.50 hat she had worn off. Witness produced the bill of the goods selected, including the hat at $6.50, and stated that none of the goods were selected with the understanding that any of them were to be returned.

Mr. Stern was recalled by the State in rebuttal. He produced the bill of goods bought by Mrs. Blum of Kausler Brothers and charged to defendant, amounting in the aggregate to $170.30, none of which were purchased with the option of returning any part.

The motion for new trial raised the questions discussed in the opinion.

*Beale & Autry*, for the appellant. When the indictment is insufficient and its allegations charge no offense, it is the paramount duty of the court to set aside the verdict and arrest the judgment. The indictment in the case fails to show any false representation upon the part of the defendant. It fails to charge in a distinct averment that the pretense of the defendant was false. It fails to charge that the defendant knowingly committed this offense. Its allegations negative the falsity of the pretense charged against the defendant. It fails to aver a delivery by defendant of the transfer disposing of his property. It fails to show that Goodman parted with his goods by reason of said false pretense of defendant. Our motion in arrest of judgment should have prevailed. (*The State* v. *Baggerly*, 21 Texas, 757; *Brown* v. *The State*, 29 Texas, 503; *The State* v. *Levi*, 41 Texas, 563; *Johnson* v. *The State*, id., 65; *Maranda* v. *The State*, 44 Texas, 442; *White* v. *The State*, 3 Texas Ct. App., 605; *Marwilsky* v. *The State*, 9 Texas Ct. App., 377; *Mathews* v. *The State*, 10 Texas Ct. App., 280; *Buckalew* v. *The State*, 11 Texas Ct. App., 352; *Stringer* v. *The State*, 13 Texas Ct. App., 520; *Lutton* v. *The State*, 14 Texas Ct. App., 522; *Mathews* v. *The State*, 15 Texas Ct. App., 474; *Allen* v. *The State*, 16 Texas Ct. App., 150.)

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. This appeal is from a judgment of conviction upon an indictment for swindling, brought under article 790 of the Penal Code.

In the view we take of the case it will be unnecessary to discuss the several questions raised in the motion in arrest of judgment as to the sufficiency of the indictment. We may, in fact, concede that

the indictment, in its formal averments, is sufficient to charge the offense of swindling, as far as the facts averred can constitute that crime. Still, in our opinion, the sole question to be determined is, do the facts averred and the facts as proven constitute swindling, under the law?

Article 790 of the Penal Code reads: "Swindling is the acquisition of any personal or movable property, money, or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or device, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring, or of destroying or impairing the right of the party justly entitled to the same."

To briefly state the substance of the charge as alleged in the indictment, it is as follows: Defendant obtained goods from one Goodman by means of false and fraudulent pretenses and devices. These pretenses and devices grew out of and were practiced by defendant under the following circumstances, viz.: That for some time prior to the 21st day of December, 1885, defendant had represented himself to be and was the owner, director and manager of a certain bakery and grocery establishment in the city of Corsicana. That, upon the faith of his possession and ownership of the property so connected with the business aforesaid, he had, for a period of more than one year, been in the habit of buying goods on a credit from Goodman, the prosecutor, and others. That, on said 21st day of December, defendant sold and transferred his entire property connected with his bakery and grocery business to his wife and step-daughter, and kept the fact of this sale and transfer secret for purposes of deception and fraud, in that he might still continue to purchase goods on a credit. That, on account of said false pretense and device, he deceived the said Goodman, who was thereby induced to sell him goods on a credit, etc., after the sale and execution of the deed of transfer of all his property to his wife and step-daughter. These were the averments.

As developed by the facts proven, it appears that defendant had been in the habit of buying goods, etc., on a credit prior to the 21st of December. He had also used in his bakery and grocery business something over $1,800 in money belonging to his wife and step-daughter. To secure these latter, or to pay them this debt, defendant on the 21st of December executed a deed of sale to all of his property. This deed was executed in the forenoon, and when defendant left it with the clerk for registration he requested the clerk to say nothing about it, as, if known, it might affect or hurt

him in his business. That same day, and, perhaps subsequently to the acknowledgment and registration of the deed, defendant's wife and father-in-law started out on quite an extensive purchasing tour, visiting several stores and business houses, and buying quite a quantity of goods at each house, regardless of the prices of the articles bought, and having the bills so made charged to defendant. Defendant was not present in a single instance when the goods were thus bought, though he may have sent his boy down to Goodman's to hurry up the goods bought of him. When Goodman sold these goods (from his previous dealings with defendant and representations previously made him by defendant, and the fact that he was ignorant of defendant's sale of his property to his wife and stepdaughter), he was still of the impression and belief that defendant owned the property, and would not have extended him the credit had he known that such was not the case. In brief, these are the main facts developed by the evidence. Do these facts establish a case of swindling under the law?

To constitute the offense described in article 790 of our Code, four things are necessary. 1st, the intent to defraud; 2d, an actual act of fraud committed; 3d, false pretenses; and 4th, the fraud must be committed or accomplished by means of the false pretenses made use of for the purpose; that is, they must be the cause which induced the owner to part with his property. (*Comm.* v. *Drew,* 19 Pick., 179; *Comm.* v. *Warren,* 6 Mass., 72; Desty's Amer. Crim. L., § 149*a; Buckalew* v. *The State,* 11 Texas Ct. App., 352.) There must be an intent to cheat or defraud. This may be inferred from a false representation, however. (13 Wend., 87; 2 Whart. Crim. L. (8th ed.), § 1184.)

With regard to the false pretense, the pretense must consist of a statement of some pretended existing fact, made for the purpose of inducing the prosecutor to part with his property; no statement of anything to take place in future will be a pretense within the act. (2 Archbold Crim. Prac. & Pleading (8th ed.), side p. 465; *Johnson* v. *The State,* 41 Texas, 65; *Allen* v. *The State,* 16 Texas Ct. App., 150; 2 Whart. Cr. L. (8th ed.), § 1173.)

" It may be laid down as a general rule of the interpretation of the words ' by' some false pretense,' which are used in the statutes, that, whenever a person fraudulently represents as an *existing fact* that which is not an existing fact, and so gets money, etc., that is an offense within the act." (1 Bouvier's L. Dic., " False Pretenses.") But " it is not necessary that the pretense or pretenses should be in words; there may be a sufficient false pretense, within the meaning

of the act, to be implied from the acts and conduct of the party, without any verbal representation of a false or fraudulent nature." (2 Arch. Cr. Prac. & Plead. (8th ed.), p. 1386.)   The conduct and acts of the party will be sufficient without any verbal assertion. (2 Whart. Cr. L., § 1170.   " Any designed misrepresentation of existing conditions by which a party obtains goods of another is within the statute."   (Id., § 1135.)

Another rule which seems to be well settled is that " where two or more persons are jointly indicted for obtaining goods by false pretenses made designedly and with intent to defraud, evidence that one of them, with the knowledge, approbation, concurrence and direction of the other, made the false pretenses charged, warrants the conviction of both."   (2 Whart. Cr. L., § 1171.)

Again, " it must appear by evidence that the prosecutor parted with his property by reason of the false pretenses alleged, and of that alone."   This is the rule announced by Mr. Archbold in his work on Criminal Practice and Pleading.   (2d vol. (8th ed.), p. 1398.)   But the rule has been held otherwise by some of the courts in this country, as for instance in *The People* v. *Haynes*, 14 Wend., 547, where it was held that " it is not necessary, to constitute the offense of obtaining goods by false pretenses, that the owner should have been induced to part with his property solely and entirely by pretenses which were false; nor need the pretenses be the paramount cause of the delivery.   It is sufficient if they are a part of the moving cause, and without them the prosecutor would not have parted with his property."   (See, also, *In re Snyder*, 17 Kans., 542; *S. C.*, 2 Am. Cr. R. (Hawley), 228.)

In *Smith* v. *The State*, 55 Miss., 513, it is held :   " It is not necessary that the false pretenses should be the *sole* inducement which moved the prosecutor to part with his property.   It is sufficient that they materially contributed to this end, and that without them he would not have parted with his property."   (*S. C.*, 3 Am. Crim. Rep. (Hawley), 92.)

" A man whose sole will procures a transaction is a principal, whatever physical agencies he employs, whether he is present or absent when the thing is done."   But the false pretense must operate as the direct cause of the transfer of " the goods, and to hold a party liable for goods thus obtained for defendant in accordance with his direction; if so, it is no defense that they were obtained mediately through a contract which the defendant's false pretense induced the prosecutor to make."   (2 Whart. Crim. Law (8th ed.), § 1180.)

Again, it may be stated as a rule " that false representations as to defendant's financial condition, made to induce a sale of goods, constitutes the offense of obtaining property by false pretenses." (*State* v. *Neymeyer*, Iowa Sup. Ct., Sept. 30, 1885.)

Another rule is "that a bargaining party also implies the existence of the conditions on which the other party depended when entering into the transactions, but at the same time it must be remembered that a bare entrance into a particular transaction is not in itself such an affirmation of the opinion of the other contracting party as to amount to a false pretense, even though the transaction be entered into fraudulently. A mere use of another's error will not make a false pretense, unless there is something done by the deceiving party to confirm such error." (See note to § 1170, 2 Whart. Am. Crim. Law.)

We have thus stated the principles of law which we think applicable to the facts of this case as shown by the record. Now, upon these rules of law has the prosecution made out a case against this appellant? We are constrained to say that we do not think it has. No false pretenses in words are claimed to have been made by this appellant; for he was not present in person, and no false pretenses and declarations are shown to have been made by the wife and father-in-law who acted as his agents in the purchase of the goods. That Goodman may have entertained the opinion that the appellant still owned the property in the bakery and grocery, and made the sale upon the belief that he still owned said property, cannot effect the question unless the acts of the parties purchasing the goods induced that belief at the time. It was simply an error of opinion upon his part; and a knowledge of the fact that he was acting upon such belief or opinion, without correcting it, will not subject the defendant or his agents to a charge of having made a false pretense by withholding the information which would have corrected his belief. It was his own opinion as to the existence of a fact which did not exist, and not the acts, declarations or representations of the parties with whom he was trading, which caused him to be deceived.

In *The Commonwealth* v. *Grady*, 13 Bush (Ky.), 285, it is held that "a false statement that a house and lot were unincumbered, when in fact they were subject to a recorded mortgage, is not a false pretense within the statute, because the party defrauded had the means of detecting it at hand, and might have protected himself by the exercise of common prudence." (*S. C.*, 2 Am. Crim. Rep. (Hawley), 105.) It is unnecessary that we should go in this

case to the extent to which the Kentucky court has gone in said case, because no direct, positive declaration or representation was made to Goodman by any of the parties, with regard to the condition of the property at the time of the purchase of the goods.

Our conclusion of the whole matter is that a case of obtaining goods by false pretenses has neither been stated by the indictment nor established by the proofs adduced on the trial of this case; wherefore the judgment is reversed and the prosecution is dismissed.

*Reversed and dismissed.*